CARTER, Judge:
This is an appeal from the trial court’s determination that plaintiff is totally and permanently disabled and, as such, is entitled to total and permanent worker’s compensation disability benefits.
'FACTS
In May of 1980, Troy Shatoska was employed as a dragline (crane) operator by International Grain Transfer, Inc. (International). The Rockwood Insurance Company (Rockwood) was the worker’s compensation insurer of International. During the early morning hours of May 7,, 1980, Sha-toska suffered a subendocardial infarction (a form of heart attack). Subsequently, on November 7, 1980, Shatoska was admitted to the coronary intensive care unit of the Slidell Memorial Hospital, and his condition was diagnosed as an acute anterlateral myocardial infarction (heart attack).
After trial on the merits, judgment was rendered in favor of Shatoska and against International and Rockwood. The trial court determined that Shatoska was totally and permanently disabled and awarded him compensation and medical benefits retroactively to the date of the first heart attack and for the duration of the disability. Defendants appealed.
This court affirmed the original trial court’s determination that (1) Shatoska’s employment caused his heart attacks and ultimate disability; (2) Shatoska was entitled to medical benefits; (3) fixed the fee due by Shatoska to his attorney; and, (4) fixed the base rate upon which compensation benefits would be calculated and cast defendants for all costs. However, the portion of the trial court’s judgment which determined that Shatoska was totally and permanently disabled was reversed and re *34 manded for presentation of evidence and resolution of the following issues:
(1) Are the services which Shatoska is capable of safely rendering in his present condition so limited in quality, quantity, or dependability that a market for his labor does not exist within which he can effectively compete?
(2) If the answer to question number 1 is “No”, then at what point in time did Shatoska reach maximum recovery for determining his entitlement to temporary, total disability payments pursuant to La.R.S. 23:1221(1) and what is his entitlement to benefits for permanent, partial disability pursuant to La. R.S. 23:1221(3) based on his present capacity to safely engage in a gainful occupation for wages?
See Shatoska v. Intern. Grain Transfer, Inc., 430 So.2d 1255 (La.App. 1st Cir.1983).
On remand, the trial court, for written reasons assigned, answered the Court of Appeal’s first question in the affirmative, finding that Shatoska is totally and permanently disabled and is entitled to total and permanent disability benefits. Defendants appeal.[1] Plaintiff answered the appeal seeking damages for frivolous appeal.[2]
Question 1: “Are the services which Shatoska is capable of safely rendering in his present condition so limited in quality, quantity, or dependability that a market for his labor does not exist within which he can effectively compete?”
In the present case, the trial court determined that Shatoska’s employment capabilities were severely restricted because of his emotional, educational, and physical limitations, and the employer did not demonstrate the existence of an actual job in the employee’s general locality at which Sha-toska has a reasonable opportunity to be employed. Thus, Shatoska was deemed totally and permanently disabled and entitled to benefits calculated on that basis.
In determining whether an employee is permanently and totally disabled, it is not a prerequisite that he be absolutely helpless. If the evidence of his physical impairment and of other such factors as his mental capacity, education, and training indicate that he can perform no services other than those which are so limited in quality, dependability or quantity that a reasonably stable market for them does not exist, the injured employee is entitled to total disability compensation unless the employer or his insurer is able to show that some form of suitable work is regularly and continuously available to the employee within reasonable proximity to his residence. Lattin v. Hica Corp., 395 So.2d 690 (La.1981); Oster v. Wetzel Printing, Inc., 390 So.2d 1318 (La.1980); Dusang v. Henry C. Beck Builders, Inc., 389 So.2d 367 (La.1980); Vernon v. Aetna Life and Cas. Ins. Co., 442 So.2d 674 (La.App. 1st Cir.1983). In other words, under this doctrine “a claimant may be considered totally disabled if, after his injury, he is considered an ‘odd-lot’ in the competitive labor market, i.e. that he may be capable of holding various jobs from time to time, but that the kind of work he may perform is so limited in quality, dependability or quantity that a reasonably stable market for that work does not exist.” The Work of the Louisiana Appellate Court for the 1977-78 Term, 39 La.L.Rev. 881, 889 (1979).
Applying the odd-lot analysis to the facts of the case sub judice, we find that the trial court determination that plaintiff is totally and permanently disabled is correct.
*35 Plaintiff’s treating physician Dr. Richard Howard, a specialist in cardiology and internal medicine, testified that Shatoska has permanent heart damage and is still (as of the date of trial) experiencing angina. Dr. Howard attributed the angina to “any stress or physical exertion. Even walking a short distance would precipitate an attack.” Dr. Howard noted that Shatoska’s recent EKG showed a worsening of his condition and that, in addition to his heart damage, Shatoska has coronary arteriosclerosis and polycythemis, conditions which aggravate his coronary problem. Dr. Howard testified that Shatoska’s physical “condition is such that he is unable and will be unable to return to any occupation requiring any physical exertion.” Without equivocation, Dr. Howard opined that Shatoska’s return to work as a crane operator would not only be dangerous to himself but to others around him because of the danger of his possible sudden death. Dr. Howard recommended that plaintiff engage in a sedentary-type occupation, depending on his education and ability to cope with emotional stress, that would involve no physical exertion.
Dr. Cornelius Gorman, plaintiff’s expert in vocational rehabilitation, evaluated Sha-toska’s employability. Dr. Gorman found that although Shatoska has a high school education and is literate, he performs at a sub-junior high school level. In administering the Zung depression scale, Dr. Gorman discovered that Shatoska has feelings of hopelessness, irritability, indecisiveness, and personal devaluation in that his score fell within the range of individuals who are depressed and should receive psychiatric or psychological treatment on an out-patient basis. Based upon his understanding of Shatoska’s mental, emotional, and medical condition, Dr. Gorman did not believe there was significant work available to Shatoska. Dr. Gorman reasoned that while Shatoska’s skills are mechanical and laborious, his physician has recommended sedentary work; however, Shatoska is not employable -in a sedentary position because he lacks skill in the clerical-technical trades. Dr. Gorman was unsure of what type job Sha-toska could safely perform without substantial rehabilitation[3] and, therefore, would not even attempt to place Shatoska in a job. In any event, Dr. Gorman noted that Shatoska’s cumulative medical condition would present a serious problem with reemployment.
Dr. Christy Graves, defendant’s specialist in cardiology and internal medicine, examined Shatoska and performed a stress test. The examination revealed old and recent myocardial disease with activity angina. Dr. Graves noted that Shatoska was still having angina which was definitely activity-related with occasional rest-related angina. The stress test revealed that Sha-toska had very little exercise tolerance. After only three minutes into the exercise, Shatoska became symptomatic and developed chest pains, which were substantiated by the EKG tracings. Dr. Graves testified that she “would certainly not recommend that any gentleman that had this history and this positive a stress test at so early in the course operate a dragline, primarily because not only is this a dangerous occupation from the standpoint of harm that could be done if something happened to him on the dragline, but he is utilizing arm muscles that require a fair amount of muscles to pull levers on draglines. And these types of activities, it can definitely aggravate angina.” Dr. Graves indicated that if Shatoska had been operating a dragline subsequent to his heart attack, he had been extremely lucky that he had not suffered another attack. Dr. Graves recommended “a sedentary type of work and certainly not something involving dragline activity. Specifically, just a desk job.” In assessing disability, Dr. Graves was of the opinion that Shatoska is at least partially disabled in that he could physically perform only in a sedentary position.
*36 We conclude, as did the trial judge, that Shatoska established a prima facie case that he is totally and permanently disabled. The evidence shows that he was fifty-one years old at the time of his initial heart attack in May 1980, and that he cannot now safely perform any type of physical activity. Although he is literate and graduated from high school, Shatoska has a sub-junior high school performance level. His work experience is limited to crane and dragline operation, and he has been so employed since he graduated from high school in 1947. The following excerpt from Dr. Cornelius Gorman’s testimony at trial clearly provides an affirmative answer to the first question posed by this court in its prior decision:
Q. Can you answer that question for us about whether or not the services which Shatoska is capable of safely rendering in his present condition so limited in quality, quantity; or dependability, that a market for his labor does not exist within which he can effectively compete?
BY THE COURT: I would ask you to give me a yes or no answer and then explain your answer.
A. Okay. I believe that’s a true statement, that according to my understanding and according to the medical data I have from Mr. Shatoska, not having seen or talked to the physicians, I don’t believe that there is significant work available today, and I want to qualify that by saying, his prior skills I understand to be mechanical and laborious. I understand from him that his medical doctor limits him to either sedentary or light work. • There is a big difference between sedentary and light, however, and I don’t have clarification on that. Secondly, the interests that he has on the basis of his personal analysis, his likes, his dislikes, his interaction with other people, are such that he is not employable in them because he doesn’t have any skills in the clerical technical trades. Now were that to change, then perhaps my answer could change, but right now I don’t understand him to be trained nor practiced in the clerical technical fields and for that reason I could only respond affirmatively, affirmatively to say that I am at a loss to recommend anything else. He’s tried security guard work. He’s tried to return to work, and I can’t solve that problem. I’m stymied. (Record pp. 131-132)
Clearly, the evidence establishes that because of his failing health, his lack of tolerance for physical activity, and his lack of skill for sedentary work, Shatoska can perform no services other than those which are so limited in quality, dependability, or quantity that a reasonably stable market for them does not exist.
When the plaintiff is successful in showing a combination of factors indicating that the services which he is able to render are so limited in quality, quantity, or dependability that a market for his labor does not exist within which he can effectively compete, he has presented a prima facie case for classification in the odd-lot category. An offering of such proof by the plaintiff, therefore, satisfies his burden of proving that he should be awarded benefits for permanent and total disability. The defendant employer then has the onus of showing that there are jobs which are available to provide a steady income to the plaintiff or that will provide him with “a gainful occupation.” It is fairer to place the burden on the defendant to show that there are steady jobs available to the plaintiff, after plaintiff has shown his odd-lot status, than to require the plaintiff to prove the universal negative of not being employable at any occupation. Oster v. Wetzel Printing, Inc., supra; Brown v. Safeway Stores, 82 N.M. 424, 483 P.2d 305, 308 (N.M.App.1971); Lyons v. Industrial Special Indem. Fund, 98 Idaho 403, 565 P.2d 1360, 1363 (1977); Larson, The Law of Workmen’s Compensation, § 57.61 at pp. 10-136-137. This apportionment of the burden of proof is equitable for the additional reason that the Louisiana statutory *37 scheme does not include any effort to rehabilitate the injured worker. Oster v. Wetzel Printing, Inc., supra.
The evidence introduced by defendants fails to rebut a finding that Shatoska is permanently totally disabled to engage in gainful occupation for wages. The defendants offered only the testimony of Dr. Graves to rebut plaintiff’s showing; however, Dr. Graves’ testimony supported rather than rebutted plaintiff’s evidence.
Dr. Graves testified as follows:
On that day I actually didn’t want to do the stress test in my office that day because he was feeling poorly. He had complications of a recently acquired upper respiratory infection. And after reviewing his history and physical, I suggested that we do a Thallium stress test, which I felt would give us more information than the stress test. However, after looking at the stress test, which he wanted to go ahead and “get over with,” we didn’t have to go to the Thallium.
The stress test, the resting electrocardiogram was done and showed sinus grade bicardial or slow heart rate. He had a borderline left axial deviation. There was suggested evidence of an old lateral wall myocardial infarction.
The stress test was done and the patient was found to have very little exercise tolerance. His resting blood pressure prior to being placed on the machine was one hundred fifty-eight over seventy. His maximum blood pressure achieved during the test was one hundred eighty-eight over eight-eight, indicating a fairly good blood pressure control. In his recovery, blood pressure was one hundred twenty-two over eighty. That can be important because sometimes if positive exercise drops the pressure of this significance, it can indicate poor left ventricular function. However, this is not able to be interpreted in this study alone.
What is important is that in the third minute of stage one, which is only three minutes into the exercise, he became symptomatic. He did develop chest pain and I actually asked him if he was symptomatic. I said, “How do you feel?” And he said, “I’m beginning to get some chest pains.” Because the EKG changes on the stress test were definitely positive changes from the base line. And that is indicated by changes in the electrocardiogram, which indicates significant change in the blood flow during exercise.
My physical exam correlated with the chest x-ray which showed evidence of mild left ventricular enlargement.
His laboratory studies indicated normal kidney function. His liver function was mildly elevated, mildly, about six points above normal. And, in fact, we repeated the liver function. I don’t have the results here. But the mild elevation is not significant. His cholesterol was in the upper limits of normal. His trigly-cerol was high. Those are two fatty components of the blood. Thyroid studies were normal.
In summary then, this was a fifty-three year old white male coming in for evaluation with previous history of MI and clearly still having angina apparently definitely activity related with occasional rest-related angina. Physical examination as well as laboratory studies were indicative of old and recent myocardial disease with activity angina. His lung evaluation both clinically and laboratory wise were consistent with a moderate amount of chronic lung disease. I should say that I had forgotten to mention this, but his force vital capacity that we did on the lung capacity was fifty-five percent and sixty-three percent with a normal being about eighty-five to eighty-eight percent. So, we had some significant changes there.

EXAMINATION BY MR. PIERCE:
Q. So that is what we have here, basically. And the question I think that we’re all primarily interested in, would you feel from what you found that, and in considering the history that I gave you, that Mr. Shatoska could safely operate a dragline?
*38 A. I would certainly not recommend that any gentlemen who had this history and this positive a stress test at so early in the course operate a dragline, primarily because not only is this a dangerous occupation from the standpoint of the harm that could be done if something happened to him on the dragline, but he’s utilizing arm muscles that require a fair amount of muscles to pull levers on drag-lines. And these type of activities, it can definitely aggravate angina.
Now, I feel that this fellow really should have had, but certainly probably for his own well-being, should really have a coronary arteriogram. I think there is evidence of previous myocardial infarction for sure and now angina. I think this man needs a more thorough cardiovascular exam to date. I’m note sure why he hasn’t had it. But I’m sure any physician that would see his case would say that he needed an angiogram. He’s fifty-three years old and fairly disabled with regard to his angina.
I would think the type of activity that I would want or feel safe to suggest would be a sedentary type of work and certainly not something involving dragline activity. Specifically, just a desk job. (Deposition pp. 8-11, 13-14)
The only evidence in the entire record that could be argued as supportive of the defendants’ position is the following testimony of Dr. Graves:
EXAMINATION BY MR. PIERCE:
Q. Okay. Doctor, you can go ahead and answer.
Do you feel that he’s partially disabled or totally disabled or what do you think?
A. I think that he is at least partially disabled from the standpoint of returning to his previous occupation which I think is not in his best medical interest as a cardiac patient. I do feel like this type of individual can be rehabilitated in a sedentary-type position. I do not feel that he is totally disabled. I'm making those statements on the basis of one complete physical examination. But that is my initial impression.
Q. I understand that.
Do you feel at this point that he’s a candidate for bypass surgery?
A. I feel that any patient who is post MI is a candidate for bypass surgery if an angiogram indicates continuing disease. I feel that he’s a candidate for an angiogram certainly because of his previous myocardial infarction history and the fact that I am of the feeling that he is having symptomatic angina now and angina now. (Deposition pp. 22-23)
Clearly, there is a difference between the medical definition of total and partial disability and the legal definition of these words, especially when the legal issue is whether a workmen’s compensation claimant falls within the “odd-lot” doctrine. Harris v. Louisiana Paving Co., Inc., 427 So.2d 1352 (La.App. 2nd Cir.1983).
Therefore, we find the defendants’ evidence totally insufficient to rebut Sha-toska’s showing that he can safely perform no services other than those which are so limited that a reasonably stable market for them does not exist. Accordingly, we hold that the plaintiff is entitled to an award of total and permanent disability benefits.
Because we find that the services which plaintiff is capable of safely rendering are so limited that he cannot effectively compete in the labor market, we find it unnecessary to answer the second question.
FRIVOLOUS APPEAL
Plaintiff contends that he is entitled to and should be awarded damages and attorney fees for the defendants’ frivolous appeal. Plaintiff reasons that this appeal has been interposed purely for the purposes of delay and that defendants’ should be cast for the damages caused by such unwarranted delay.
As we clearly stated in Jackson v. East Baton Rouge Par. Sch. Bd., 348 So.2d 739, 741 (La.App. 1st Cir.1977):
Article 2164 of the Code of Civil Procedure authorizes a claim for damages for frivolous appeal, but its provisions are penal in nature and must be strictly con *39 strued. Appeals are favored,' and the imposition of penalties for frivolous appeal will not be granted unless they are clearly due. Damages for a frivolous appeal will not lie unless it manifestly appears that the appeal was taken solely for delay or that appealing counsel does not seriously believe in the position he advocates, even though the appeal lacks serious merit.
See also, State v. Laconco, Inc., 430 So.2d 1376 (La.App. 1st Cir.1983). Where contentions on appeal are without merit, but raise legitimate issues, damages for frivolous appeals are not allowed. Sample v. Sample, 432 So.2d 376 (La.App. 1st Cir.1983); Mauboules v. Broussard Rice Mills, 379 So.2d 1196 (La.App. 3rd Cir.1980), writ denied, 381 So.2d 1234 (La.1980).
In the instant case, an examination of the record reveals that on remand defendants called no witnesses on their behalf and introduced no exhibits. The only evidence produced by defendants was the deposition of Dr. Christy Graves, their expert in internal medicine and cardiology. Dr. Graves’ deposition supports plaintiff’s contention that he is physically incapable of performing any type of work requiring physical exertion or emotional stress. Defendants did not even attempt to meet the onus of showing that there were jobs available to provide a steady income to plaintiff or jobs that would provide him with “a gainful occupation.”
Since defendants did not present any evidence to refute plaintiff’s evidence that the services which he is capable of rendering in his present condition are so limited in quality, quantity, or dependability that a market for his labor does not exist within which he can effectively compete, we' can only conclude that this appeal was taken solely for delay. Cf. Galland v. Nat. Union Fire Ins. Co., 452 So.2d 397 (La.App. 3rd Cir.1984). Cf. also Mauboules v. Broussard Rice Mills, supra; Dwyer Lumber Co. v. Murphy Lumber and Supply Co., 116 So.2d 64 (La.App. 1st Cir.1959).
La.C.C.P. art. 2164 provides the “court may award damages for frivolous appeal.” The record does not demonstrate that ap-pellee incurred pecuniary or nonpecuniary damages as a result of this frivolous appeal. However, he did incur an attorney fee for protecting his judgment on appeal and this is an element of “damage” under La.C.C.P. art. 2164. Samford v. Samford, 297 So.2d 465 (La.App. 2nd Cir.1974). Ap-pellee is awarded an attorney fee of $2,500.00. Cf. Favrot v. Favrot, 388 So.2d 87 (La.App. 1st Cir.1980); Moity v. Busch, 368 So.2d 1134 (La.App. 3rd Cir.1979); L. Frank & Company, Inc. v. Devillier’s Foodliner, Inc., 365 So.2d 501 (La.App. 4th Cir.1978).
Therefore, we award plaintiff damages and attorney fees for frivolous appeal in the amount of $2500.00.
DECREE
For the assigned reasons, the judgment of the trial court awarding plaintiff total and permanent disability benefits is affirmed. Additionally, we award plaintiff damages in the amount of $2,500.00 for frivolous appeal with legal interest thereon from the date of this opinion until paid. Heard v. Blakney, 415 So.2d 487 (La.App. 1st Cir.1982).
AMENDED AND AFFIRMED.
COLE, J., dissents from the award of attorney fees, believing this not to be a frivolous appeal.

. On appeal, defendants contend that:
(1) Under the facts of this case, the "Odd Lot Doctrine” is not applicable, and
(2) the medical evidence is insufficient to support a judgment of total and permanent disability.
Although we will not address defendants' assignments of error individually, the opinion adequately discusses the issues raised by them.

. Plaintiff also filed a motion to dismiss, contending that defendants’ appeal was frivolous and without merit, which was denied. See Shatoska v. Intern. Grain Transfer, Inc., (La.App. 1st Cir.1984), Docket No. 84 CA 0687, August 21, 1984.

. Dr. Gorman estimated that substantial rehabilitation, as would be required in Shatoska’s case, would cost f 15,000.00.